Our next case is Snyder v. Navy. This is 16-1940. This is 16-1940. Mr. Graham, you reserved five minutes of your time for rebuttal, correct? That's correct, Your Honor. Okay. You may begin. May it please the Court. My name is Michael D. Graham. I represent the petitioner in this case, Dr. Victoria Snyder, Ph.D., who is a mechanical engineer at Naval Surface Warfare Center, Dahlgren. She's also my spouse. We've been married since 2009. You're representing your wife today? Yes, sir. Best of luck. Okay, sir. High stakes. So I'm told, sir. In any event, follow the money. Those were the words that were uttered by Deep Throat to Bob Woodward in the movie and also the book, All President's Men, as an anonymous source that ultimately brought down the presidency of Richard Nixon. You might rephrase that saying in this case to follow the funding source, follow the money, because in September of 2012, Naval Surface Warfare Center, Dahlgren, signed a Cooperative Research and Development Agreement, otherwise known as a CRADA, with Lockheed Martin. They signed that in September of 2012. It was for a term of three years. It was signed by the base commander. It was signed by Lockheed Martin. It made very clear in that document that it was worth about $2.6 million that the funding source for the CRADA was Lockheed Martin Independent Research and Development Funds. The board held that CRADA funds were used to pay indirectly Ms. Snyder's salary but that there was no difference between her situation and that of working capital fund employees. Can you focus on that? Why should we consider that the board erred on that, on finding that there's no difference? First of all, the board below composed two members in a split vote. One of them voted in our favor. We don't know why or how they did not produce an opinion. That's why the administrative law judge's decision below is the law of the case. We would submit that, first of all, he didn't consider any of the proof or detracting evidence that we presented in this case. We cited the Federal Technology Transfer Act that dates back to 1980, Title 15, United States Code of 3710. We talked about the fact that there is a statement in that act, 3710AD1, that expressly says, as a matter of law, that while the Federal Laboratory at Naval Warfare Service Dahlgren could provide resources and personnel and expertise, they could not provide any money. In contrast, the only money that could be provided would be by the non-Navy or non-governmental collaborator, which in this case is Lockheed Martin. They, in fact, produced $2.6 million in advance of this particular project. Now, this is done in September of 2012. Six months later, the sequester is announced in light of the budget dispute between the Congress and the President. The Secretary of Defense letter… So Ms. Snyder was working there at Dahlgren prior to these circumstances. That's correct. She dates back to 2002. So assume that the circumstances never come up, the sequestration and issues and all. She would have continued working there at Dahlgren, correct? Yes, sir. And I think, I don't know whether or not… So the only difference here that we're looking at is that for a period of time, her salary was paid, at least indirectly, through the CRADA. That's correct, Your Honor. During a period of January to about September of 2013, almost all of her time, and we've produced her time cards in particular that were coded for the CRADA project that she was working on. And we had her supervisor, her… So if her position was not dependent on the CRADA… Then she would have been furloughed. And her salary was not dependent on the CRADA. She would have been furloughed like everybody else. But what we have contended is that she was entitled to this exception I because the Secretary of Defense memo from the 14th of May 2013, he said that most, if not all, of the Department of Defense employees would be furloughed to include the working capital funds. But then he came out with nine exceptions. The nine exceptions were based upon emissions, but they were also based upon funding sources because if the funding sources were such that there would be no savings that would come back to DOD, then what would be the point of furloughing that person because there wouldn't be any savings in that particular case. And so in this particular case, when we had the video hearing before the Administrative Law Judge, the agency came out with two witnesses. One witness had been the agency rep in a prior case there at Dahlgren. She was the head of Labor and Employee Relations. But significantly, she was not the deciding official. So she's kind of articulating what could have been decided by Mr. Cook, who was the technical director at Dahlgren. And there were these emails that talked about work for private parties. They didn't say anything about CRADA. They said work for private parties. And from the very beginning of the furlough appeal, Dr. Snyder has been consistent throughout. I'm entitled to this exception because I'm working on a project that is not funded by federal money. It's funded by Lockheed Martin money. And she also produced this letter from one of the subcontractors that stated the 30th of May, 2013, making it very clearly that they had been the ones that came forth, fully funded the project. It was Lockheed Martin money. Can I try to focus on something that is on my mind? Yes, sir. As I understand it, it's your position that the CRADA project was funded by Lockheed. And so, therefore, these are non-federal funds that are the origins of Ms. Snyder's and Dr. Snyder's salary during this critical time period. That's fact one. Fact two, though, is that her salary during the relevant time period was being paid from Dahlgren's working capital fund. And so we have this earlier opinion called Einboden, which says when an employee is being paid out of a working capital fund and there's some budgetary crisis like a sequestration, furloughing someone that's being paid out of the working capital fund saves that agency money in order to be able to use it for higher priorities in this emergency situation. So now that if we have to accept the fact that she was, in fact, paid out of the working capital fund and she wasn't being paid directly by Lockheed, what is wrong with the AJ's conclusion that, just like in Einboden, Dahlgren here was able to save money from that working capital fund that he could use for higher priorities during this critical time period? I think what the problem is is that, and the AJ was also the same AJ in Einboden, and I just think that he wanted to revisit what he had written before. And he did not make the critical distinction that this case is not Einboden and this case is not NFV 1442 versus Department of Army. This case is a case based upon Exception I, which says that if you have a funding source that is not federal money and you can't save money for the federal government back to DOD, then you should be accepted. It's interesting that— I guess what's the nature of the working capital fund? Isn't that essentially the budget for Dahlgren? All these cases before have talked about governmental customers coming in with DOD or other federally appropriated money. None of these cases have talked about a private contractor coming in with their own independent money and is a customer to the government. And they're a customer to the government because what's going on between Lockheed Martin and the government is there is a transfer of this technology expertise with respect to, in this particular case, the advanced ship weapons control system, which is this computer system, a software system that talks to a missile so that the missile is able to properly launch off the ship and then go into the air and ultimately hit its target. It's not a missile project. It's a software project for the surface warfare system on the ship. There's been some confusion about that. There's even been some allegations that, well, gee, really the money is coming from the United States government. No, it's not. It's coming from Lockheed Martin. I think the problem is that when you get into the testimony, and I know there's some concern about substantial evidence, but substantial evidence means that you don't just take into account that there might be some thread that they can hang their hat on and say, gee, it's working capital fund money, when there's a lot of detracting evidence elsewhere in the record, such as as a matter of law, what the Federal Technology Transfer Act is about, the fact that it has to be non-federal money, the fact that we put the CRADA into evidence. The CRADA itself shows that the money came from Lockheed Martin. The CRADA itself says that if there's excess money, it doesn't come back to the United States government, according to Article 5. It goes back to Lockheed Martin. There are no savings to the United States government, and there's certainly no savings to DOD in this case. And if there are no savings to DOD, then Exception I is the exception that should apply. Mr. Graham, let me ask you a question quickly. As I understand it, Dr. Snyder, it's paid out of the working capital fund, and the working capital fund would get reimbursed from the CRADA funds that were provided by Lockheed. Is that correct? There is an attachment to the CRADA. I believe the attachment is Attachment 1 to Enclosure 2, and they show the split off of labor costs. But the interesting thing about that, not only does it show that the labor costs are paid for by Lockheed Martin, but they're also talking about paying computer costs, travel costs. Well, I understand that, but what I'm getting at is that Lockheed paid this money to the government, and it went into the working capital fund, although there were separate accounts kept. Yes, sir. Now, when Dr. Snyder was furloughed, can the government use that money, the money that it had from Lockheed, for any other purpose? No, sir. We don't believe so. So those funds were earmarked for that work, and when that work is not performed, then the funds remain there. That's correct, sir. So Dahlgren really doesn't save anything. That's correct, sir. That's been our position throughout. And the interesting thing is, further, that when you get into the labor advisor, she says things like, well, I'm not familiar with what a CRADA is about. I did not discuss or advise Mr. Cook regarding the CRADA. I did not have anybody review the CRADA. I cannot speak to what Mr. Cook did or did not do as far as having reviewed the CRADA. He's the one who's got to decide whether the categorical exception, Exception I, is going to apply or not. And, of course, with respect to the MSPB case of Dye versus Department of Army, that whether or not the categorical exception applied or not goes to whether or not she was properly furloughed for cause and whether or not it does or does not promote the efficiency of the service. We would say that it did not because she qualified for the exception, but he didn't properly decide that. She couldn't figure out what the CRADA was about. Frankly, when we got to getting the testimony of Ms. Clark, the comptroller, she didn't know anything about the CRADA or about the fact that whatever CRADA money wasn't used would end up going back to Lockheed Martin. And there's ever so slight of a concession by the agency in their brief at about page 23 that eventually somehow, if there was savings to Lockheed Martin, that it wouldn't be, as you say, ever expendable to the government, but would come back to Lockheed Martin. Perhaps it would be at the end of the three-year term of the contract, but it would never come back to the government. It could only come back to Lockheed Martin. Okay, I'm going to stop you there. You've used up most of your time. Thank you, Your Honor. But we'll give you back some rebuttal time. Okay, sir. All right, thank you. Counselor Stern. May it please the Court. This case really is in line with the Court's decisions in Einboden and Naffey v. Department of the Army. And in those cases also, the employees basically made the argument that the working capital fund had enough money, more than enough money, to pay their salaries in some cases because there was carryover from private years and in some other cases because they were already obligated funds. And the Court's decision really didn't turn on whether there was funding in the working capital fund. In fact, in Naffey, the Court specifically said that the arbitrator was correct to focus on the budget shortfall in DOD as a whole. What it focused on, what the Court focused on was the savings that the Department of Defense established could be realized from not paying working capital fund employees their salaries during the period of furlough. And when you look at a budget, the working capital fund has personnel costs that come off those employees. Federal employees are paid every two weeks. So when that date hits, the working capital fund has to pay salaries. In this case, there were something like $500 million in salaries that were saved from the period of furlough, in this case by furloughing working capital fund employees at the moment of that furlough. So at that moment, there was a savings on the budget. There was a budgetary savings of $500 million. This case is a little different from those cases, right? Because now we're dealing with a situation where the CRADA and the non-federal funds that are being contributed, that are supporting Dr. Snyder's salary here for this particular time period. So now there's an argument being made that the sequestration is about federal funds and what we have here are non-federal funds. I understand the argument, Your Honor, and that is a difference, but it's not a material difference. Well, please speak to that then. Why is it not a material difference? It's not a material difference because the funds that are being saved and the funds that are affected by the sequestration are the working capital funds. Those are the funds that could be transferred to higher priority needs. But Dr. Snyder's salary, while it came out of the working capital fund, the working capital fund would get reimbursed from the CRADA funds. It would, and here's where timing becomes important, Your Honor. Is Mr. Graham's answer correct, that the CRADA funds could not be used by the government for any other purpose? That is correct. Then how does the government save money in this circumstance? Okay, let me see if I can explain it this way. If we think of the furlough as a pause, a pause in everything, it's a pause in the work. It's a pause, in effect, in also the work on the Lockheed Martin project. So a pause happens at that moment. Now, if Ms. Dr. Snyder works, the working capital fund has to pay her salary. That's money out of the working capital fund. If they pause it, the working capital fund doesn't pay that money. So it's got, at that moment, it's got that savings. Now, a week later, about a week later, the furlough's over. Ms. Dr. Snyder goes back to work. She works. The working capital fund pays her salary for that period, and the CRADA comes back to reimburse it for that period. That doesn't mean that there was no savings during that period of the furlough, because now the CRADA is going to pay her for now this work that followed the CRADA. But during the actual, I mean, the furlough, sorry. But during the furlough itself, there was that savings. So things are being basically postponed down the line. But if she had not been furloughed, she would have been paid out of the working capital fund, and the working capital fund would have been able to immediately, I assume, get reimbursed from the CRADA funds that it already possessed. And I think the difference is that arguably, she could make the argument that the working capital fund would not necessarily have lost money because they would have been reimbursed, that they would not have realized the savings at the time they needed the savings. So at that moment that there was that pause for the furlough, the working capital fund realized an actual savings by not paying Dr. Snyder. Now, later when work started up again and that relationship began again with money going out from the working capital fund and coming back from the CRADA, somewhere down the line, maybe five years from now when the project was over and there was a full accounting, there might or might not be some kind of money that would be returned to Lockheed Martin if there was some excess of funds. But at that moment, the working capital fund crisis or the bigger sequestration crisis that was affecting the Department of Defense would no longer be in existence. So the point is that ZOD needed the savings at the moment that it furloughed the employees. At that moment, on paper, that savings was realized because no money was going out of the working capital fund to pay Dr. Snyder as well as all of these other working capital fund employees. Whether or not the working capital fund itself had money to pay the salaries of these employees, they had carryover funds, I mean, these were the same arguments that were made. What I'm having difficulty with is that it seems to me that the funds that the government possessed that were earmarked for the crater, the Lockheed funds, are not fungible with the other funds, even though it's in one working capital fund, that the government couldn't use those Lockheed funds for other purposes. So it seems to me that while she was furloughed, it was in effect the crater that saved the money, not the working capital funds available to the government generally. Well, I think what we have to look at is that there's a budget, a military budget, and the working capital fund is included under that military budget. And so when the Department of Defense looks at its budget and sees that working capital fund has, you know, billions of dollars in it, whatever it has, let's say, I'll say $800 million, because I know the savings was $500 million, so I'm going to pick a number bigger. When the Department of Defense looks at that working capital fund and sees that it has $800 million, and that by not paying six days' worth of salary to all the working capital fund employees, including Dr. Snyder, it's going to save $500 million. That's like I said, that operates at that moment in time, and that's the way the budget works. At that moment that they don't cut those checks and pay that money, they are realizing a savings in that budget that can be transferred. When the work picks up again, yes, that money flows out to Dr. Snyder, and the working capital fund can turn around and basically bill Lockheed Martin, take the money out of the crate of funds that are in the working capital and reimburse it. So the relationship picks up again, but it doesn't change the fact that during the period of the furlough, there was a savings in that budget. How can those savings be traced? There's no actual tracing of the funds. I mean, it's just a fungible bag of money, and money comes in and the bag gets bigger. Money goes out, the bag gets smaller, and it seems to be this argument that the administrative law judge found. He noted, he said in reaching this finding with reference to what I'm talking about, he says, I note that it is highly improbable that Lockheed Martin goes on and talks. It based this very important finding on what seems to me to be a personal assessment that it's highly improbable. I don't find that to be substantial evidence, and apart from that, I don't see any other evidence in the record with respect to tracing these funds from the funding source to Dr. Snyder's salary. So correct me if I'm wrong on that. Otherwise, I would tend to say that that decision is not supported by substantial evidence. Well, what I would say, Your Honor, is that the focus on the funding source is just the wrong focus. Because even if you look at the exemptions that are in the record, and I'm looking at Appendix Page 186, that's the exemption, including Exemption I, in which Dr. Snyder is attempting to depend. The exemptions are not based on where funding comes. Funding is really not relevant to the issue in this case. And that's why I started off by saying in Einboden and Nafee, the court really did not focus on the funding of the projects in the Working Capital Fund or whether there were enough funds to pay employee salaries. What they focused on was the fact that the Working Capital Fund budget itself saved money by not paying salaries. And if you look at the exemptions on Page 186, Exemption I, it doesn't talk about funding. It talks about the only people who will be exempted are employees who are not paid directly from accounts included in the Department of Defense military budget. But Dr. Snyder, according to Kathy Clark's testimony, and I would argue that that's the essential substantial evidence in the record that supports this Court's decision. Kathy Clark testified, undisputed testimony, that Dr. Snyder's salary was paid by the Working Capital Fund. That is a Department of Defense military budget item. And for that reason, Dr. Snyder doesn't fall within Exemption I, which is only employees who are not paid by accounts in the Department of Defense military budget. The question for me is, what is the nature of the Working Capital Fund? Are there boxes inside of the Working Capital Fund? Like, OK, certain funds are earmarked for certain things, or certain funds come from certain sources. And so therefore, we treat them somehow a bit differently than other funds inside the Working Capital Fund. There definitely are monies that are trapped within the Working Capital Fund, definitely. But the Working Capital Fund, the entire budget, including the monies coming in from Lockheed Martin, are part of the military budget that shows up as affected by sequestration. Now, those tracked funds, I would agree, they are marked for that. But when you look at the budget, and Dr. Snyder's salary is paid out of that budget, that budget is part of the DoD military budget. And that's what the exemption applies to, where the salary of the employee is paid from, what budget account, and not where the funding for a particular project is coming in. Because if that argument was pertinent, then in Einbone and NAFI, the court would have looked. They would have said, OK, which project did these particular employees who were appealing work on? Was that project funded? Were the funds deobligated? The court didn't care about that. How many individuals are affected by this case? Is this Dr. Snyder? It's Dr. Snyder, yes, Your Honor. Just Dr. Snyder. A single individual appealing in this appeal. Does it impact other cases that may be out there regarding sequestration? Well, clearly there were other Working Capital Fund employees. I don't know if there are any others that are in the pipeline that are in exactly the same position as she is. I feel like there might be. But this case is a single-level appeal. Again, I would just say that— But we don't have a bunch of cases backed up somewhere waiting for this case to be decided. Not that I'm aware of. OK. Not that I'm aware of. If hypothetically the CRADA agreement ended, say, August 31, 2013, OK, inside the fiscal year where this sequestration happened, then it wouldn't have been useful at all for DOD, for Dahlgren, to furlough Dr. Snyder that summer. Is that right? Well— If there was any monies paid by Lockheed and those weren't used to pay salaries, then all those monies would have needed to be paid back to Lockheed by the end of the CRADA. Right. That is actually not necessarily the case. And Dr. Kathy Clark explained why that was true. And I tried to get at it a little bit when I was talking about sort of the pause. Because, again, the work that didn't happen during that period of the furlough would be— Let me get back to the terms of the CRADA. The terms of the CRADA says at the end of the term of the agreement, any monies that Lockheed has paid in that haven't actually been used, right, for the CRADA, they all get returned to Lockheed. Right. That's true. But the agreement provides for certain work to be performed. So presumably that work is still going to be performed just at the end of the furlough. It's going to pick up again. So the work—it's not that the work is not going to be done. It's going to be done. Right. But the CRADA ends whenever the CRADA ends, right? That's true. But the hours of work that will be required will be put in somehow. What I'm trying to do is create a difference for you. I know. I understand and I appreciate it. where maybe, you know, under a different set of facts, she would fall within Exception I. But in this particular instance, maybe she doesn't fall within Exception I. Well, I guess all I'm saying is that— I'm thinking of the rehill fact pattern, where in that particular instance, someone was—an employee in the summer was being paid by the University of Chicago, but the term of that agreement ended within the fiscal year. So it wouldn't make any difference to—it wouldn't help Mr. Rehill in that particular instance. Or it did? I guess I would answer the question two ways. One is I would say that perhaps there would be a stronger argument in that case, but I'm still not going to concede that it would actually fulfill that argument. And the other thing I would say is that the validity of the furlough has to be judged by the circumstances at the time that it's imposed. At the time that this was imposed, in fact, the Lockheed Martin cradle was not at an end. It had some period of time to go with more work to be performed, whether that work would be performed, you know, whether it would involve overtime work or whatever. But the hours that were— So what you're saying is at the end of the day, it's just guesswork whether there's going to be any savings as a result of the furlough. Not at all, Your Honor. Just with respect to Dr. Steiner. I'm not saying that at all, Your Honor. What I'm saying is that at the moment that that payroll did not have to be made, there was a savings realized. At that moment in the Working Capital Fund's budget, they didn't have to cut that check to that employee because she was an employee of the Working Capital Fund. Clearly, she was not an employee of Lockheed Martin. And kind of using the analogy we used in our brief with a law firm where, yes, one lawyer might be devoting all of their work to a particular client's work and that client maybe is turned around and billed for that time. If that attorney doesn't work for a week, is furloughed for a week, and the law firm doesn't have to pay their salary for that week, the fact that when the week is over, the lawyer will resume working on that client's project and the law firm will resume getting reimbursement for the work performed. But for the week of that furlough, that lawyer and the Working Capital Fund. Who keeps the end product here? Who keeps the end product? Right. I believe it was Lockheed Martin. It's Lockheed, right? So isn't Lockheed getting the savings here? They're not saving anything because the work is eventually going to be performed after the furlough, after the savings are realized when the work relationship and the money relationship resumes. But during the period of the furlough, there's a savings realized by the Working Capital Fund from not paying Dr. Snyder's salary. Okay. We thank you very much. Thank you, Your Honor. Mr. Graham? We'll restore you to three minutes of your time, okay? Yes, sir. Thank you. Well, it's interesting that the agency seems to think that by furloughing Dr. Snyder, that there was actually money saved when there were other issues in this case, and that you raise an issue with respect to how overtime was manipulated by the agency in this case because there was a compromise. And the compromise, as enunciated by Larry Fontenot, a witness, basically said that because of the CRADA, or I should say because of the furlough, that they were going to get overtime in order to make up for time that they were going to be furloughed. And the government's own documents show that, gee, this is non-DOD money, and we're not going around the CRADA. I don't know how you're saving money if you're at one time furloughing people on one day and then on the weekend you're having them work overtime on the rationale that we don't have to worry about DOD money because we've got Lockheed Martin money in this CRADA. I find that to be kind of contradictory. The agency also said that Kathy Clark, the comptroller, seemed to think that there were savings to the government. But in the last question that I asked her on cross-examination, I said, but there are no savings to the government, there are only savings of Lockheed Martin, right? I can't answer that one, I do not know. Because she was not familiar with how this unique document at CRADA actually, in fact, worked. And so, consequently, I would say that there is no evidence that there were savings to the government, whether or not you have this pause that is talked about. In responding to your question, Your Honor, about the decision-making by the administrative judge, not only did he talk about the testimony of Ms. Snyder, who was not the deciding official and kind of didn't even understand the CRADA, and he talked about the comptroller, who didn't understand the CRADA, he then goes off into an area that is, as we said, speculative, which is why we brought up substantial evidence in that particular quote from those series of Supreme Court cases. In reaching this finding, I note that it is highly improbable that Lockheed Martin, a publicly traded company, would expend its own capital to develop a missile for the Department of Navy. Instead, I find the money Lockheed Martin paid into the working capital fund pursuant to the CRADA must have been money, must have been money, that can be traced to DOD appropriations. And, of course, this is where he confuses the projects. He confuses the weapons control system, the software system program on the ship versus a missile. That's a stretch. There's no evidence of that. If he had looked at the Federal Technology Transfer Act, he could have understood that a company such as Lockheed Martin would, in fact, expend its own independent research and development money in order to develop something, in order to get a leg up in future procurements down the line with the United States government, as happened in this case. Mr. Graham, before you sit down, your time has expired, but before you sit down, what's your response to Ms. Stern's argument that Exception I doesn't apply here because Exception I only applies to employees who are not paid directly by accounts? And here, Dr. Snyder clearly is paid out of the working capital fund. Yes, Your Honor, but cases such as Rehill, the Naval Academy cases, the Dye versus Department of Army case talks about where the money came from and whether or not the employee was entitled to the exception. In this case, we would say that the efficiency of the service wasn't promoted because she should have been granted the categorical exception because she was being funded to include her retirement out of the Lockheed Martin Freight. Okay. Thank you very much. We thank you very much. Our final case today is Rivera v. ITC 16-18.